

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00049-CR

Amanda Marie **MONTOYA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR11671
Honorable Christine Del Prado, Judge Presiding

Opinion by:    Lori Massey Brissette, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Liza A. Rodriguez, Justice
Lori Massey Brissette, Justice

Delivered and Filed: December 4, 2024

AFFIRMED

Appellant Amanda Montoya was charged with manslaughter and domestic violence aggravated assault after she admitted to shooting and killing her boyfriend, Cesar Gallegos. Physical evidence from the scene corroborated Montoya's admission. While Montoya contends that the shooting was accidental, the critical issue at trial and on appeal is whether Montoya acted recklessly. The jury ultimately acquitted Montoya of manslaughter but convicted her of

domestic violence aggravated assault. In our review of the jury's verdict, we conclude that the evidence supported Montoya's conviction. We affirm the trial court's judgment.

## BACKGROUND

Montoya's 911 call and Gallegos's neighbor's testimony established that Montoya and Gallegos were involved in a romantic relationship. The neighbor testified that she saw the two drinking beer and dancing together in Gallegos's yard on the night of the shooting. She stated that it sounded like they were having fun.

In Montoya's statement to Detective McNelly, Montoya said that, at one point, Gallegos took his gun outside and "was shooting to some people out at the yard." She stated that when they went back inside, Gallegos coaxed her to not be upset with him. She responded that he knew she did not like firearms. She stated that Gallegos encouraged Montoya to take the gun and pull the trigger, promising her that nothing bad would happen.[1] Then, according to Montoya's 911 call, she shot Gallegos. Bexar County Forensic Scientist Crystina Vachon stated that the gun was fired from about one-and-a-half to two feet away from Gallegos.[2]

After the shooting occurred, Montoya ran to the neighbor's house and banged on the door, telling the neighbor to call 911 because she accidentally shot Gallegos. Montoya then located her phone and also called 911. Montoya was crying and frantic. She told the dispatcher that she shot Gallegos. Crime Scene Investigator Richard Sanchez later swabbed Montoya's hands for gunshot residue, and Sergeant Brian Peters swabbed Gallegos's hands. Forensic Scientist Crystina Vachon tested the swabs. Vachon's test results showed gunshot residue on

---

[1] The medical examiner's report later showed that Gallegos's blood alcohol level was .207 at the time—about two and a half times the legal limit for driving.

[2] She arrived at this conclusion by examining firing tests performed by Forensic Firearm Examiner Ed Wallace to reproduce the gunshot reside pattern found on Gallegos's shirt.

both swabs. Forensic Scientist Vachon also swabbed and tested the gun that was recovered from Gallegos's home, but she was unable to discover a DNA profile from the gun swab.

When emergency personnel arrived at Gallegos's home after the shooting, they at first had difficulty gaining access to Gallegos because Montoya could not bring herself to follow commands and let them in. Both Sergeant Rivera and Sergeant Resendiz were among the first officers to respond to the scene, and they both testified that they experienced delay in gaining entry into Gallegos's home. A 911 operator called Montoya because she had not gone outside after the first dispatcher instructed her to wait outside for police. The 911 operator spent seven minutes persuading Montoya to leave the gun on the bed and walk outside, but Montoya was sobbing. She said, "Just let them come inside. Let them see *me* and how much I love my husband—how much I love my boyfriend." She said, "I'm not gonna do anything." The 911 dispatcher continued to insist that Montoya open the front door and Montoya ultimately complied.

Once the police and EMS were able to reach Gallegos, they found that he was deceased. Sergeant Resendiz testified that she saw Gallegos laying on the bed, on his back, bleeding. A later examination of Gallegos's body showed that the bullet entered his right upper chest above his nipple and exited his left upper back near the edge. Gunpowder tattooing on the back of Gallegos's right arm showed that his arm was likely across his chest when the gun was fired.

Once officers cleared the crime scene, they obtained a search warrant to collect evidence. Crime Scene Investigator Richard Sanchez collected Gallegos's Glock handgun from the bed. He testified that it contained a magazine with two bullets and that there was a bullet in the chamber. He also found a spent casing on the floor next to the bed. He collected two magazines containing bullets from the top of the dresser next to Gallegos's bed and three boxes of bullets from a

dresser drawer. There was a Glock gun case on the floor next to the dresser. He also recovered a bullet from the living room wall that he testified shot through the bedroom wall before becoming lodged there.

Police drove Montoya to police headquarters to take a statement from her. While the detective was collecting personal information from her, Montoya interrupted to say, "Before we go further on, I will hire myself an attorney. And I don't need an attorney because all of this was uncalled for. My boyfriend had a freaking gun. He *knew* I hate weapons. He was shooting to some people out at the yard. Make a long story short, we came back inside. He's like—he cocked the gun, and he's like, 'Aw come on babe, why are you getting all, like, huffy puffy?' And I'm like, 'No, I just don't like guns.' Make a long story short, he's like 'come on, just grab it, pull the trigger, and it's going to be okay.' Well, then, that, it just, everything went too fast, and…."

The detective stopped Montoya and asked whether she was sure she wanted to continue the interview, since she mentioned hiring an attorney. Montoya stopped the interview. She was arrested and, after a jury trial, Montoya was convicted of domestic violence aggravated assault. She now appeals her conviction, challenging the evidence of recklessness.

### STANDARD OF REVIEW

This court must review the evidence in the light most favorable to upholding the verdict and affirm the judgment if the "jury [was] rationally justified in finding guilt beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)). A jury can be rationally justified in convicting a defendant based on its evaluation of the evidence that leads to reasonable inferences in support of a guilty finding beyond a reasonable doubt. *See Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016).

In general, juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Id*. (quoting *Hooper*, 214 S.W.3d at 15).

"'[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them,' while '[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented.'" *Id*. (quoting *Hooper*, 214 S.W.3d at 16). "A conclusion reached by speculation…is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id*.

What this means for the State' case is that "direct evidence and circumstantial evidence are equally probative and circumstantial evidence alone can be sufficient to establish guilt." *Vega v. State*, No. 05-21-00225-CR, 2022 WL 17883796, at *1 (Tex. App.—Dallas Dec. 23, 2022, no pet.) (mem. op., not designated for publication) (citing *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013)). In fact, "[p]roof of mental state must, by necessity, almost always depend upon circumstantial evidence." *Sadler v. State*, 728 S.W.2d 829, 831 (Tex. App.—Dallas 1987, no pet.). The State's burden to prove its case beyond a reasonable doubt does not require it to disprove every conceivable alternative to a defendant's guilt. *See Vega*, 2022 WL 17883796, at *1 (citing *Tate*, 500 S.W.3d at 413).

In our review of the State's evidence and the jury's verdict, we consider the possible conclusions that led to the defendant's conviction and evaluate whether the inferences that could have led there were logical. But ultimately "this court may not sit as a thirteenth juror and substitute its judgment for that of the fact finder by reevaluating the weight and credibility of the

evidence." *Temple v. State*, 342 S.W.3d 572, 584 (Tex. App.—Houston [14th Dist.] 2010) (citing *Brooks*, 323 S.W.3d 893 at 904–05, 909–12).

**RECKLESS MENS REA**

**A.      Parties' Arguments**

Montoya argues that no rational factfinder could have convicted her without additional proof of her mental state. The State argues that the jury could reasonably infer that Montoya was aware of and consciously disregarded the risk of serious bodily injury that can be caused by a firearm.

**B.      Law**

*1.  Recklessness Defined*

The Texas Penal Code defines acting recklessly as follows:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PEN. CODE ANN. § 6.03; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

As stated in *Williams*, "[a]t the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct." *Williams*, 235 S.W.3d at 751 (citing *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)). "Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Id*. A defendant's culpable mental state may be inferred from words, acts, or conduct of the accused and from the circumstances under which the act occurred. *Caballero v. State*, No. 13-20-00109-CR, 2021 WL 2231266, at *3 (Tex.

App.—Corpus Christi–Edinburg June 3, 2021, pet. ref'd) (mem. op.) (citing *Linden v. State*, 347 S.W.3d 819, 822 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd)).

### 2. *Recklessness Inferred*

In general, "[i]t is mandatory that [firearms] be handled at all times with great care and the failure to do so may be legitimately viewed by the trier of the fact as 'a gross deviation from the standard of care that an ordinary person would exercise....'" *Sadler*, 728 S.W.2d at 832 (citing § 6.03(c)); *see also Davis v. State*, 757 S.W.2d 386, 388 (Tex. App.—Dallas 1988, no pet.) (affirming conviction where the victim was shot while defendant was twirling a gun he believed to be unloaded) "Findings of recklessness have been upheld even when the defendant did not intend to point a firearm at the victim." *Id.; Salinas v. State*, 644 S.W.2d 744, 746 (Tex. Crim. App. 1983) (discharge of pistol with no intent to kill merited charge on involuntary manslaughter).

Even if a person handling a firearm believes it to be unloaded, pointing it in the direction of another is nonetheless considered reckless conduct. *See* TEX. PENAL CODE ANN. § 22.05(c); *Guzman v. State*, 188 S.W.3d 185, 192 (Tex. Crim. App. 2006); *see also Carrasco v. State*, No. 05-93-01515-CR, 1994 WL 416720, at *4 (Tex. App.—Dallas Aug. 10, 1994, pet. ref'd) (mem. op., not designated for publication) (affirming conviction where shooter believed gun was unloaded when he killed complainant with it).

## C.    Analysis

Although Montoya urges this court to consider that she did not want to shoot Gallegos and that the incident should be considered a tragic accident, Texas caselaw suggests that this court should accept as reasonable an inference that Montoya acted recklessly by pulling the

trigger of a gun that was pointed at Gallegos. *See Sadler*, 728 S.W.2d at 832; *Davis*, 757 S.W.2d at 388; *Salinas*, 644 S.W.2d at 746.

A number of inferences could reasonably be made from the evidence presented. First, it is reasonable to infer that she knew and appreciated the dangers posed by handling a gun. She stated that she told Gallegos she did not like guns. Second, it is reasonable to infer that she was aware of the risk that the gun was still loaded as she stated that he had been shooting the gun outside just before the incident occurred. Third, it is reasonable to infer that she pointed the gun at him since the bullet entered his chest and was fired just one and a half feet from him. Fourth, it is reasonable to infer that she pulled the trigger since gun residue was found on her hands, she told the neighbor that she accidentally shot Gallegos, and there was testimony that significant force was required to fire the gun (twice the force required to open the tab on a soda).

Montoya argues that her handling of the gun should nevertheless be considered negligent rather than reckless—a standard she did not request for consideration in the trial court's jury charge. As stated in *Williams*, "[c]riminal negligence and recklessness differ from one another only in terms of mental state. A criminally negligent defendant 'ought to be aware' of a 'substantial and unjustifiable' risk, while a reckless defendant is subjectively aware of an identical risk but disregards it." *Williams*, 235 S.W.3d at 751. Here, Montoya stated that she did not like firearms. She, further, knew the gun had been fired just before. There is no evidence that any action was taken to empty the gun, and additional bullets were still in it when confiscated. *See id.*; *see also Davis*, 757 S.W.2d at 388; *Carrasco*, 1994 WL 416720, at *4. All of this evidence together leads to a logical inference that Montoya knew that there was danger involved in shooting Gallegos's gun and that she disregarded it. *See Williams*, 235 S.W.3d at 751.

Based on this record, we conclude that the jury did not act irrationally in finding that Montoya acted recklessly. *See id*. Accordingly, Montoya's issue on appeal is overruled.

## CONCLUSION

Because the evidence supports the jury's conclusion that Montoya acted recklessly, we affirm the trial court's judgment.

Lori Massey Brissette, Justice

DO NOT PUBLISH